# Snyder's Appeal.

1. A testator by his will gave all his estate, " except such reversions as I may hereafter make," to his daughter Venticia, appointed guardians for her and authorized them to spend the whole proceeds in her education. By a codicil he appointed his daughter Mary guardian of Venticia's person, " to take her in charge, attend to her education and see that she is well brought up." By another codicil he ordered that Mary " shall have her main support from the Shull farm." Venticia by ejectment recovered the possession of the Shull farm from Mary. This was an acceptance of the devise and Venticia personally and the land became liable for the support of Mary according to the terms of the codicil. Per JUNKIN, P. J.

2. The estate which the testator owned at his death was much greater than the Shull farm, but was absorbed, except a small sum, in payment of his debts. *Held*, that the amount to which Mary would otherwise have been entitled from Venticia as the owner of the Shull farm should be abated.

January 30th 1874, Before AGNEW, C. J., MERCUR and GORDON, JJ. SHARSWOOD, J., at Nisi Prius.

Appeal from the Orphans' Court of *Snyder county* : No. 200, to January Term 1873. In the estate of John Snyder, deceased.

The proceeding commenced September 25th 1871, by the petition of Mary K. Snyder for a citation to H. C. Eyer, administrator d. b. n. c. t. a. of John Snyder, deceased, George W. Walls and Venticia Irene, his wife, late Snyder.

The petitioner set out: That her father, John Snyder, died about August 15th 1850, having made his will dated May 9th 1846, and two codicils, one without date, and the other dated August 15th 1850. By his will he devised all his estate to his daughter Venticia Irene, since intermarried with George W. Walls, who is now

25 P. F. SMITH—13

[Snyder's Appeal.]

of age, and residing with her husband in Lewisburg, Union county. By the last codicil (of August 15th 1850), he provided as follows: "And I do further order that Mary K. Snyder, my daughter, shall have her main support from the Shull farm." The petition further averred that the "Shull Farm" was part of testator's real estate, devised to his daughter Venticia Irene, and was situate in Union township, Snyder county, containing 217 acres of land, now in possession of a tenant of the respondents. And that both respondents and their tenant refused to allow the petitioner any support from the said farm, and had denied her right thereto. That the annual rental of said farm was from $300 to $400, all of which would be required for her support as provided in the will. And praying a citation to the defendants to show cause why petitioner should not have her main support from the Shull farm, as directed by the said will.

The answer of George W. Walls and Venticia Irene, his wife, admitted they were in possession (by their tenant) of the Shull farm. But they said that the petitioner had not applied for, or been refused a support from said farm; that the income thereof was barely sufficient for necessary repairs; that petitioner had possession of said farm from testator's death till the fall of 1870, and suffered it to go to decay, by bad husbandry, and that for years to come the repairs necessary to make the place habitable and fruitful would more than exhaust the income, and that during the past year the taxes and necessary repairs to the house had cost nearly the whole income. They further said that the provision in the codicil was too vague, general and indefinite to support the claim of the petitioner, and that the court had no jurisdiction.

The testator had been twice married; Mary K. and Elizabeth M. were daughters of the first marriage; Utica V. (long since dead), and Venticia Irene, of the second.

The testator by his will, after referring to some supposed domestic troubles with the mother of his first wife, provided:—* * *

"I do hereby bequeath unto my three daughters, namely: Elizabeth M., Mary K., and Utica V., each of them one dollar, to be paid to them or their heirs, by my executors, within six months after my death; and to my daughter Venticia Irene I will and bequeath all my estate, real, personal and mixed, and all claims or demands whatsoever to which I may be entitled by law, equity, bequest, reversion or otherwise, excepting such reversions as I may hereafter make. Should my daughter Venticia live to become of age, married or single, and should she become satisfied Utica was deserving of her assistance, she may pay her fifteen hundred dollars, in such manner and at such a time as she may see proper, but at no time shall it be considered as a bequest by me, as I now consider her unworthy of my notice or protection, but shall remain a claim on the discretion of Venticia

[Snyder's Appeal.]

to pay when and in amount what her judgment may suggest; the education of her children should be a consideration of primary importance.   But should Venticia die without heirs, it is my will that the estate should be valued by the three nearest president judges, and divided into three shares, so that the homestead may be possessed by two of my daughters or their heirs. * * *

" The twelve acres of land in Neitz's Valley, called Springfield, I will to Amelia, daughter of Susanna Hanes, now Mrs. Dehaven, and to her heirs also. * * *

"Lastly, I constitute and appoint my cousin, Dr. H. A. Lechner, and my friend, Alexander Jordan, Esq., my executors; I also appoint them the guardians over the person and estate of Venticia and Amelia, hoping they will attend to the education of Venticia, and I allow them to spend the whole proceeds of the estate, excepting twenty dollars, which I wish them to apply to the education of Amelia, together with the proceeds of the one hundred and ten acres of land, until said Amelia shall become decently married.

"My debts are not numerous; my account books have references which will, I hope, explain all difficulties in settlements; my unsettled accounts with Buckman Claflin, in Hana, Licking county, Ohio, will pay more than my debts; his agreement with me will show our relation; for the land on the Sinamahony, about one thousand acres, I have no deeds.   Mr. C. is honest, and will account for store debts, land, and all. * * *

JOHN SNYDER."

The codicils provided:— * * *

" I do hereby constitute and appoint my daughter, Mary Kittera, guardian of the person of Venticia Irene, my youngest daughter. She, the said Mary, to take her in charge, to attend to her education, and see that she is well brought up.   I do also hereby appoint my friend, J. W. Smith, as executor, in addition to those already mentioned in the will to which this is a codicil, and also appoint him as guardian over the estate of my daughter Venticia Irene.   I do hereby revoke anything in my former will which may conflict with this codicil."

"Thursday, 15th August, A. D. 1850.

" Being weak in body, but possessed of all my faculties, and upon the full reflection consequent on life and death, I have hereunto set my hand and seal to the foregoing, and I do further order that Mary K. Snyder, my daughter, shall have her main support from the Shull farm."

. The petition and answer were referred to L. N. Myers, Esq., as auditor to report the facts.

The auditor took a large number of depositions, which he reported to the court, and which were filed; he did not find any facts.   They are, however, stated in the opinion of Junkin, P. J.,

of the 9th district, who presided in the Orphans' Court when the case was heard.   Amongst other things Judge Junkin says:  * * *

" When he made this will in 1846, he was, apparently, the owner of considerable property, and was living at the time on a farm of fair value, and by odds the chief bulk of his real estate, located near the rising town of Selinsgrove ; had flocks and herds, and was esteemed by others, and himself believed, a man of ample fortune for a country gentleman. * * *   He points out a single item or claim of personal property due to him, which he says is undisputed and amply sufficient to pay all his just debts.   Nevertheless, from the negligent manner in which he transacted his daily business, it became necessary to sell the farm he lived and died on, in order to liquidate his debts, so that of all his estate there remained but $1000 in money and the Shull farm, * * * his valuable real estate near Selinsgrove having been sold for payment of debts.   The Shull farm contains 204 acres, value from $20 to $30 per acre, say worth $5000, one hundred acres thereof cleared and under cultivation, balance fairly timbered ; soil naturally good, but hilly, producing with negligent cultivation from ten to fifteen bushels of wheat per acre, eighty of corn in ear, thirty of oats, and located within three miles of Selinsgrove and Susquehanna river, canal and railroad, and in Snyder county.   Under ordinarily good husbandry, the net proceeds to the owner of the fee should be $200 per annum, as shown by the evidence ; the improvements are a good barn and comfortable dwelling-house, but fences out of repair.

" From the death of John Snyder until September 1869, or perhaps until April 1870, Mary K. Snyder had, in a general sense, the control and management of this Shull farm, either as guardian of her young sister Venticia, or as the person entitled to its proceeds, under her father's will.   But it is clear that she aided from its proceeds, or from her own means, to educate Venticia, giving the latter also the advantage of her own intelligence and culture, and generally was diligent and faithful to her trust.   In September 1869, Venticia Irene, then and now Mrs. Walls, recovered in ejectment against Mary K. Snyder, the Shull farm, she fearing that Mary might, if suffered longer to occupy the farm, set up title by adverse possession.   But this assertion of title, under her father's will, on the part of Mrs. Walls, is an acceptance of the devise, and brings the case within the principle of the case of Hoover *v.* Hoover, 5 Barr 351, that both the person and estate of an accepting devisee of real estate, charged with a legacy, become liable for its payment.   And in Mohler's Appeal, 8 Barr 26, even an alienee of an accepting devisee, was held liable to the extent of the rents and profits by him received whilst in possession.   These cases are re-affirmed in Steele's Appeal, 11 Wright 438 ; McCredy's Appeal, 11 Wright 442 ;  Clark *v.* Wallace, 12 Wright 80 ;  Field's Appeal,

12 Casey 11; Conard's Appeal, 9 Id. 47. And unless the present case can be distinguished from the cases just cited, there is no more to be done, than to make a decree accordingly.

"We pass on, however, to consider the meaning of the words 'main support,' as used in John Snyder's will. It means that, *generally and chiefly*, Mary shall receive her support from the Shull farm. It is to be her chief reliance, and no more need be said on this point. The difficulty arises from the inadequacy of this land affording her even one-half of her reasonable support, so that there is no danger that she will receive the whole, and anything short of the latter will be but main, and short of entire. The testimony shows that she ought to receive $400 per annum at least, and this would exclude everything save the actual necessities of life; luxuries and display are in any aspect of the case out of the question. If the funds were at hand she should have all that is required to maintain her in a style becoming her rank and honorable descent; but first of all come bread and shelter, then, if at all, luxurious elegance. But where is even sufficiency of bread and shelter to come from? We have no magician's wand, with which to give the exuberance of the tropics and the beauties of the Orient to the sterile hills of the Shull farm. It is a fixed fact that under the best of culture it can only yield $200 per annum. This is the lion in our path, and must, from necessity, temper the decree.

"Looking then into the four corners of this will, it is clear that the chief object of his bounty was this young child, Venticia Irene, then but nine years old (at testator's death), for he gives her nearly his entire estate, and only when his prejudices against the elder daughter were relaxing in the jaws of death, does he squeeze out of the Shull farm a support for her, then arrived at her majority. But concede each alike, the object of his bounty and the issue is still the same.

"First, then, did he even apprehend the possibility of the farm on which he lived and died being swept away for payment of his debts, so that, besides the Shull farm, only $1000 remained? As it has turned out, Venticia has this $1000 and the fee in the Shull farm, subject to her sister's *main* support, and was at the time of tender years. If we *so* decree, that Venticia must sell the Shull farm to pay for Mary's support, we rob the younger to sustain the elder. Venticia will then get *less* than nothing, and from being the devisee and legatee of her father's estate, subject to this annuity, she will be beggared; the inheritance will turn to ashes in her hands; she who was to receive *most*, will obtain *least*, and the whole intent of the testator will be reversed. This compels us to consider what John Snyder himself, if living, or having knowledge, at the time of making his will, of the small estate he was leaving, would have done. The principle of abatement inter-

venes generally where the testator has mistaken his means, and does equity. The trouble in the present case, however, arises from the positive doctrine of the cases cited, and many others to the same effect not here alluded to. They seem to *clinch* the personal liability of the accepting devisee with much firmness, apparently leaving no room for exception. Nor do we feel at all assured of the correctness of the position we are about to assume, in distinguishing the present from the cases cited, but the danger of fixing an over burthen on this devisee is so imminent, that we are compelled to be astute to avoid the peril. * * * "

The judge, after examining and comparing numerous authorities on the point he was discussing, proceeded :—

" Then we find that in all the cases, except in Hoover *v.* Hoover, the fund being ample and there being *no loss of the main or most valuable part of the devise,* so that no disturbing element not foreseen by the testator is introduced (such as in this case, to wit, the total loss to the devisee of the main devise, in bulk as well as value, and that chief portion too unencumbered), *then* shall the devisee be held as accepting *cum onere,* and must pay the uttermost farthing. But when eight-tenths of the intended devise is taken to pay debts, and that remaining happens to be the part specifically charged, then the principle of abatement is invoked that equity may be done. Now, by whatever name you call this provision for Mary's support, it is so nearly an annuity, that we will speak of it by that name. In Roper on Legacies, vol. 1, page 419, we find that ' there is no distinction between a legatee and an annuitant, in regard to the general rule of abatement, for the bequest of an annuity out of, or charged upon the general personal estate is not specific,' * * * it is, therefore, not privileged from abating with the other legacies ; and the mere circumstance of the bequest being an annuity raises no inference of an intention that the testator meant it a precedency, in payment, upon which he might claim an exemption. * * *

" Now the testator *first* gave Mary a main support, and then says it shall come from the Shull farm. Then, in case the Shull farm had been recovered from the devisee by a superior title, and there had been ample estate besides this farm, would the support of Mary have been lost ? According to the authorities (for the *rents* and *profits* are not bequeathed for her support) she could have recovered this *quasi* annuity from the general assets of her father's estate ; and if she could, then this support to her is not specific ; then it is liable to abate, along with the other legacies and devises, upon a general insufficiency of assets to pay the bequests, &c. If Mary could thus, in a certain contingency, call for her support out of other assets than the Shull farm, why may not Venticia also, upon the estate intended for her being swept away to pay debts, even in relief of the Shull farm, call upon Mary to suffer a

part of this general loss? As already shown, the fact that she is *quasi* an annuitant does not forbid abatement, and in the particular case equity calls earnestly for some equalization of this unexpected loss. It was agreed on the argument that the court should ascertain the income of Mary K. Snyder as postmistress of Selinsgrove. That we ascertain to be six hundred dollars, but we do not think it affects in any way the question before us; neither does Sheldon *v.* Purple, 15 Pickering's Rep. 528. Now, then, what more can be done with the limited resources of this testator's estate than simply to give Mary the largest share of the annual profits of the Shull farm, fixing them at $200 per annum? And it will be remembered that to bring this sum the farm must be brought (and at Venticia's expense) and maintained to a much higher degree of fertility than it has hitherto, under Mary's management, attained. To give *more* is impossible, and to give *less* is mockery."

The decree of the Orphans' Court was:—

"And now, to wit, 22d August 1872, the auditor in this case having failed to report his opinion on the facts, in aid of the court, we have, nevertheless, rather than delay the cause, looked carefully into and considered the evidence, *whereupon*, after due deliberation, it is hereby ordered and decreed that Venticia Irene Walls do pay to Miss Mary K. Snyder, the petitioner, for the year commencing 1st of April 1870, and ending 1st of April 1871, the sum of $75; and for the year ending April 1st 1872, the further sum of $100; and for the year commencing April 1872, and ending April 1st 1873, the like sum of $100; and that she further pay to said Mary K. Snyder annually, on each first day of April thereafter, the sum of $133, unless before said time there is some further order made by this court: the costs of this proceeding to be paid by the said Venticia I. Walls."

Mary K. Snyder appealed to the Supreme Court, and assigned for error that the Orphans' Court erred :—

1. In not decreeing that there should be paid to the petitioner from the Shull farm a sum sufficient for her main support.

2. In deciding that the bequest to the petititioner of a sum sufficient for her main support was subject to abatement.

3. In deciding that the amount to be paid to petitioner for her main support was to be measured by the annual profits of the land upon which it is charged.

4. In not decreeing that the respondents should pay to the petititioner at least $400 *per annum*, beginning from April 1st 1870.

*E. C. Mitchell* and *S. Linn*, for appellant.—The gift to Mary is a legacy, in the nature of an annuity charged upon land: Cra-

[Snyder's Appeal.]

ven *v.* Bleakney, 9 Watts 19; Hamilton *v.* Overseers, 2 Jones 147; Marcy's Estate, 10 Harris 140; Steele's Appeal, 11 Wright 437. When Mrs. Walls recovered the Shull farm, she became bound personally as was the land for her sister's support, according to the terms of the will: Hoover *v.* Hoover, 5 Barr 351; Mohler's Appeal, 8 Id. 26; Venticia's devise was residuary: Preston on Legacies 178. Roper on Legacies 411; Willard's Appeal, 18 P. F. Smith 327; Walker's Estate, 3 Rawle 229; Gallagher's Appeal, 12 Wright 121. The residuary legatee cannot have the estate marshalled to relieve it from the payment of legacies: Greville *v.* Browne, 7 H. L. Cases 689.

Mary's legacy is demonstrative or specific: Armstrong's Appeal, 13 P. F. Smith 312; 1 Roper 670. The land itself (not the rents only) was charged with the payment of Mary's legacy, for which a sale might be decreed under the Act of February 24th 1834, sect. 59, Pamph. L. 84: 1 Br. Purd. 450, pl. 222; Marcy's Appeal, 10 Harris 140.

*J. M. Linn,* for appellees.—The amount of Mary's allowance must depend upon the circumstances of the case; Craven *v.* Bleakney, 9 Watts 19; those of the testator and the condition in life of the legatee; Marcy's Estate, 10 Harris 140; Earp's Will, 1 Parsons 457; Postlethwaite's Appeal, 18 P. F. Smith 480. The support here means over what the legatee may earn: Seldon *v.* Purple, 15 Pick. 528; Duncan *v.* Alt, 3 Penna. R. 384.

The opinion of the court was delivered, March 2d 1874, by

MERCUR, J.—It is clearly evident that, when John Snyder executed his will, he over-estimated the value of his residuary estate. He manifestly intended his daughter Venticia Irene to be the great object of his bounty. He supposed she would take property of much greater value than all which actually remained after the payment of his debts. He thought his personal estate was more than sufficient to pay all his indebtedness. It appears, however, the debts and the expenses of educating and maintaining the appellee also absorbed the proceeds of his most valuable farm, except the sum of one thousand dollars. This fact should not be overlooked in determining the sum to be paid to the appellant. The evidence, however, wholly fails to show the value of all the real estate of which the testator died seised.

We think the evidence fairly justifies the conclusion of the court below, as to the sum annually required for the "main support" of the appellant, according to the intent of the will. We also think the diminished value of the estate requires that some abatement should be made from the sum to which the appellant would otherwise be entitled. We cannot, however, concur in the extent of the

[Snyder's Appeal.]

abatement made, nor adopt the reasoning by which the learned judge reached that result.

The evidence shows conclusively that the appellant most faithfully and affectionately discharged her trust as guardian of the appellee. She spared no expense in giving her a thorough education at the best female seminaries of the country. She thereby necessarily reduced the residuary estate. The estate thus diminished for the benefit of the appellee, is now rather ungraciously interposed to the prejudice of the appellant. How many thousand dollars were expended in the maintenance and education of the appellee the evidence fails to disclose. Those who have thus educated a daughter can form some opinion of the sum required for that purpose.

The "Shull" farm is all that remains of the real estate. It contains 204 acres. About 100 acres thereof are improved; the remaining portion is covered with valuable timber. The evidence will not justify us in putting the valuation of the whole farm at less than $6000. In the present condition of the improved land, $200 may be a fair annual rental. This, however, is likely to increase. It further appears that the appellee at one time took timber from the unimproved land worth three times that sum. This source of income appears to have been wholly overlooked or disregarded by the court below. It may be urged that the removal of the timber encroaches upon the *corpus* of the estate, and thereby gradually destroys it. To this we answer: good husbandry will hardly justify the permanent retention of more than one-half of the land in an uncultivated condition. Besides, as the timber shall be removed, the acres of cultivated land will be increased, and consequently an increased annual rental will necessarily follow. Upon the whole we have concluded to modify the decree, and increase the sum to be paid annually to the appellant.

And now, March 2d 1874, it is ordered, adjudged and decreed that the decree of the court below be and the same is hereby reversed and set aside; and it is now further ordered, adjudged and decreed that the said Venticia Irene Walls does pay to Mary K. Snyder, the appellant, five hundred and fifty dollars, on the 1st day of April, 1874, and the further sum of two hundred dollars annually, on the 1st day of each April thereafter, until otherwise ordered; that the costs of this appeal be paid by the appellee, and the record be remitted to the court below with instructions to enforce this decree.